# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>)<br>) |
| v. | )<br>) 1:18-cr-00020-JDL |
| LARRY O'NEAL, | )<br>) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

The Defendant, Larry O'Neal, is charged with possession of child pornography in violation of 18 U.S.C.A. § 2252A(a)(5)(B) (West 2018). O'Neal moves to suppress statements that he made on January 19, 2018, to three federal agents during an interview at the Customs and Border Protection (CBP) Port of Entry in Houlton, Maine, where he worked. ECF No. 39. A hearing on the Defendant's motion was held on September 25, 2018. For the reasons discussed below, I deny the motion.

### I. FACTUAL BACKGROUND

O'Neal is employed as a CBP officer at the Houlton Port of Entry. In the days leading up to the interview on January 19, Homeland Security Investigations (HSI) Special Agent Edward Ainsworth became aware of a computer that was trading in child pornography. He traced the IP address for that computer to O'Neal's house and then obtained a search warrant for the house. Because O'Neal works as a CBP officer and typically carries a weapon, Agent Ainsworth decided to execute the warrant when O'Neal would not be at home, as a matter of officer safety. Agent Ainsworth obtained

1

O'Neal's work schedule and arranged for O'Neal to be interviewed at the Houlton Port of Entry during one of his shifts, simultaneously with the execution of the warrant at O'Neal's home.

Agent Ainsworth, along with Jonathan Posthumus, a Senior Special Agent with Immigration and Customs Enforcement (ICE) Office of Professional Responsibility (OPR), and James Perro, a Special Agent with the Department of Homeland Security (DHS) Office of Inspector General (OIG), arrived at the Houlton Port of Entry just before 7:30 in the morning on January 19. O'Neal arrived not long afterwards wearing his CBP uniform, including an outer ballistics vest and duty belt, which holds a firearm, handcuffs, a baton, pepper spray, and a multi-tool or knife. O'Neal was scheduled to work that day at an Enrollment Center located on the other side of the border in Canada. Officers are not allowed to bring their firearms and duty gear over the border, so he checked those items in a lock box upon arriving at the Port of Entry.

After O'Neal checked his duty gear in, the Assistant Port Director, Joseph Ewings, asked O'Neal to go upstairs with him to retrieve a printer to take over to the Enrollment Center, a task Ewings had asked O'Neal the previous evening to see him about when he arrived for work the next day. Ewings and O'Neal took the elevator up to the second floor and walked down the hallway until they reached a doorway that leads to a common area, which serves as a break and copy room, and through which there are three additional offices. Agent Ainsworth was waiting just outside the doorway, and as O'Neal and Ewings approached, he introduced himself to O'Neal

and asked if O'Neal would be willing to talk with him inside the adjacent room. O'Neal agreed, and he and Agent Ainsworth walked through the door into the common area; Ewings turned and walked back down the hall.

Inside the common area, Agent Posthumus and Agent Perro introduced themselves to O'Neal. Agent Posthumus then told O'Neal that he was not under arrest, that he was free to leave at any time, and that they would like to speak with him in connection with an active investigation. Agent Posthumus invited O'Neal to speak with them inside one of the adjoining offices because the subject matter was sensitive and private; again, O'Neal agreed, and he and the three agents entered the largest of the three offices. After they entered the office, one of the agents closed the door.

The office where the interview took place is approximately fourteen feet by sixteen feet in size. That day, there was a desk located slightly to the left, from the perspective of a person walking through the door, that was askew so that one side of the desk faced the door and the other side faced the wall and window opposite the door. The front of the desk faced the right wall of the office but was not parallel to it. O'Neal sat in a chair facing the front of the desk. Agent Ainsworth sat in a chair on the far side of the desk, while Agent Posthumus sat in a chair on the side of the desk closest to the door; both faced O'Neal. O'Neal would have had to walk past Agent Posthumus to exit the room, but nothing obstructed his path to the door. Agent Perro stood behind the desk during the interview. The agents were dressed in plain clothes,

and although Agent Ainsworth had a holstered firearm on his person, it was hidden from view.

Before beginning the interview, Agent Perro explained to O'Neal his *Beckwith* rights. *See Beckwith v. United States*, 425 U.S. 341, 348 (1976). These rights are provided to people in the course of internal affairs investigations before interviews are conducted. The *Beckwith* warnings advise that the interviewee has the right to remain silent, that anything the person says may be used as evidence in a later administrative or criminal proceeding, and that the person's silence may be given evidentiary value in a later administrative proceeding. O'Neal read and signed a form acknowledging that he had been read these rights. O'Neal was not provided *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The agents then interviewed O'Neal for approximately two and a half hours, and in the course of the interview O'Neal admitted to searching for and downloading child pornography on his home computer. During the interview, O'Neal was engaged, cooperative, and he never asked to leave or to stop the interview.

At some point during the interview, the agents asked O'Neal whether he had had any sexual contact with children and he responded that he had not. When the interview concluded, the agents asked O'Neal if he would be willing to take a polygraph test to verify the fact that he had not had any inappropriate contact with children, and he agreed. Before O'Neal took the polygraph test, however, he took a break. While the polygraph machine was being set up in one of the smaller offices, O'Neal left the office area where the interview had taken place to use the restroom,

4

then went back into the then-empty larger office to wait. After the polygraph test, the agents placed O'Neal under arrest.

O'Neal moves to suppress the statements that he made during the interview with Agents Ainsworth, Posthumus, and Perro on January 19. ECF No. 39. He argues that he was in custody when he was questioned but was not provided the required warnings under *Miranda.*

## II. LEGAL ANALYSIS

"The Fifth Amendment requires police to provide a criminal suspect a *Miranda* warning before subjecting him to 'custodial interrogation.'" *United States v. Davis*, 773 F.3d 334, 338 (1st Cir. 2014) (citing *Dickerson v. United States*, 530 U.S. 428, 432 (2000)). If a suspect is not in custody when he is questioned, no warning is required. *United States v. Swan*, 842 F.3d 28, 31 (1st Cir. 2016). "In this context, custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Id.* (internal quotation marks omitted) (quoting *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)). A person is in custody if, "in light of the objective circumstances of the interrogation," a reasonable person would not have felt "at liberty to terminate the interrogation and leave." *Id.* (quoting *Howes*, 565 U.S. at 508-09). The First Circuit has identified several relevant factors including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Id.* (quoting *United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987)).

Here, O'Neal was questioned at his workplace, which was familiar territory. More importantly, the agents did not exercise any physical control over O'Neal; for example, during the break between the initial interview and the polygraph test, O'Neal left the immediate area where the interview was conducted unaccompanied to use the bathroom. *See United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (concluding that defendant was in custody in his home when agents exercised physical control over him by escorting him everywhere, including to the bathroom). O'Neal also was not physically restrained: he was not handcuffed at any point during the interview, his path to the doorway of the office was not obstructed, and no agent brandished a weapon. *See Swan*, 842 F.3d at 33; *United States v. Hughes*, 640 F.3d 428, 436 (1st Cir. 2011). Although the interview took place in a closed office, the agents told O'Neal beforehand that he was free to leave and offered that location for the sake of privacy. *See Swan*, 842 F.3d at 32-34 (concluding that interview behind closed doors at sheriff's office was noncustodial when, among other things, "the deputies made it clear to [the suspect] that she was free to leave and that the door was closed only for the sake of privacy.").

By all accounts, the atmosphere of the interview was "relatively calm and nonthreatening." *United States v. Guerrier*, 669 F.3d 1, 6 (1st Cir. 2011). None of the agents raised their voices, "badgered [O'Neal] for answers, or menaced him in any way." *Id.* O'Neal was engaged in the conversation with the agents, and he never asked to leave or to stop the interview. Furthermore, nothing suggests that the "[agent]-to-suspect[] ratio was overwhelming" to O'Neal. *United States v. Campbell*,

741 F.3d 251, 267 (1st Cir. 2013). Finally, the length of the interview does not tip the balance towards a finding of custody. The First Circuit has described a 90-minute interview as "relatively short" in duration, and the interview here lasted about an hour more than that benchmark. *Hughes*, 640 F.3d at 437. Based on the totality of the circumstances, I conclude that O'Neal was not in custody during his interview with the three agents.

O'Neal asserts that the First Circuit's decision in *United States v. Rogers*, 659 F.3d 74 (1st Cir. 2011), is analogous to the facts here and supports a finding of custody. In that case, the court held that the defendant, a naval officer, was in custody after his commanding officer ordered him to go home, where the commanding officer knew that state and local police were executing a search warrant for child pornography. *Rogers*, 659 F.3d at 76-78. O'Neal argues that the circumstances here are similar because O'Neal's supervisor, the Assistant Port Director, brought him to the area where the three federal agents were waiting and did not tell him that he was free not to talk to the agents. ECF No. 39 at 10.

O'Neal's situation is easily distinguished from the facts of *Rogers*. In that opinion, the First Circuit emphasized the importance of the fact that Rogers was "under a military order" to be at his house at the time he was questioned. *Rogers*, 659 F.3d at 78 ("[T]he most significant element in analyzing the situation is that the military had made certain that Rogers did not walk into it voluntarily . . . ."). The "inherently coercive force of military organization" made Rogers's situation unique, even as compared to a law enforcement agency. *Id.* Here, O'Neal was not subject to

7

a military order nor was he subject to any order which compelled him to meet with the federal agents; rather, Ewings simply asked O'Neal to accompany him to the second floor to retrieve a printer. Therefore, *Rogers* does not support a finding that O'Neal was in custody.

### III.  CONCLUSION

For the reasons stated above, the Defendant's Motion to Suppress (ECF No. 39) is **DENIED**.

**SO ORDERED.**

**Dated this 16th day of October, 2018.**

/s/ JON D. LEVY<br>**U.S. DISTRICT JUDGE**